UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

SHIRLEY S.,

*Plaintiff,*

Case No. 1:25-cv-13219

*v.*

Patricia T. Morris
United States Magistrate Judge

COMMISSIONER OF SOCIAL SECURITY,

*Defendant.*
_______________________________/

**MEMORANDUM OPINION AND ORDER ON CROSS-MOTIONS FOR SUMMARY JUDGMENT (ECF Nos. 11, 12)**

## I. CONCLUSION

For the reasons set forth below, Plaintiff Shirley S.'s motion for summary judgment will be **DENIED** (ECF No. 11), Defendant the Commissioner of Social Security's motion for summary judgment will be **GRANTED** (ECF No. 12), and the final decision of the Administrative Law Judge (ALJ) will be **AFFIRMED**.

## II. DISCUSSION

### A. Introduction and Procedural History

On February 3, 2023, Plaintiff applied for disability insurance benefits, alleging she became disabled on January 25, 2023. (ECF No. 6-1, PageID.83). The Commissioner initially denied Plaintiff's application on October 27, 2023, and on

reconsideration on January 22, 2024. (*Id.*). Plaintiff then requested a hearing before an ALJ, which was held on July 29, 2024. (*Id.* at PageID.35–58). The ALJ issued a written decision on October 4, 2024, finding Plaintiff was not disabled. (*Id.* at PageID.80–97). Following the ALJ's decision, Plaintiff requested review from the Appeals Council, which denied her request on August 14, 2025. (*Id.* at PageID.21–25).

Following the Appeals Council's denial of review, Plaintiff sought judicial review on October 12, 2025. (ECF No. 1). The parties consented to the Undersigned "conducting any or all proceedings in this case, including entry of a final judgment and all post-judgment matters." (ECF No. 8). Before the Court are the parties' cross-motions for summary judgment (ECF Nos. 11, 12) as well as Plaintiff's response to the Commissioner's motion (ECF No. 14).

**B. Standard of Review**

District courts have jurisdiction to review the Commissioner's final administrative decisions pursuant to 42 U.S.C. § 405(g). The review is restricted solely to determining whether "the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record." *Sullivan v. Comm'r of Soc. Sec.*, 595 F. App'x 502, 506 (6th Cir. 2014) (citation modified). Substantial evidence is "more than a scintilla of evidence but less than a preponderance." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th

Cir. 2007) (citation modified). "[T]he threshold for such evidentiary sufficiency is not high." *Biestek v. Berryhill*, 587 U.S. 97, 103 (2019). "It means—and means only—such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* (citation modified).

A district court must examine the administrative record as a whole, and may consider any evidence in the record, regardless of whether it has been cited by the ALJ. *See Walker v. Sec'y of Health & Hum. Servs.*, 884 F.2d 241, 245 (6th Cir. 1989). Courts will "not try the case de novo, nor resolve conflicts in the evidence, nor decide questions of credibility." *Cutlip v. Sec'y of Health & Hum. Servs.*, 25 F.3d 284, 286 (6th Cir. 1994). "If the [Commissioner's] decision is supported by substantial evidence, it must be affirmed even if the reviewing court would decide the matter differently and even if substantial evidence also supports the opposite conclusion." *Id.* (citation modified).

**C. Framework for Disability Determinations**

Disability benefits are available only to those with a "disability." *Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007). "Disability" means the inability "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 1382c(a)(3)(A).

The Commissioner's regulations provide that disability is to be determined through the application of a five-step sequential analysis:

> (i) At the first step, [the ALJ] consider[s] [the claimant's] work activity, if any. If [the claimant is] doing substantial gainful activity, [the ALJ] will find that [the claimant is] not disabled.
>
> (ii) At the second step, [the ALJ] consider[s] the medical severity of [the claimant's] impairment(s). If [the claimant] do[es] not have a severe medically determinable physical or mental impairment that meets the duration requirement . . . or a combination of impairments that is severe and meets the duration requirement, [the ALJ] will find that [the claimant is] not disabled.
>
> (iii) At the third step, [the ALJ] also consider[s] the medical severity of [the claimant's] impairment(s). If [the claimant has] an impairment(s) that meets or equals one of [the] listings in appendix 1 of this subpart and meets the duration requirement, [the ALJ] will find that [the claimant is] disabled.
>
> (iv) At the fourth step, [the ALJ] consider[s] [his or her] assessment of [the claimant's] residual functional capacity and . . . past relevant work. If [the claimant] can still do . . . past relevant work, [the ALJ] will find that [the claimant is] not disabled.
>
> (v) At the fifth and last step, [the ALJ] consider[s] [his or her] assessment of [the claimant's] residual functional capacity and . . . age, education, and work experience to see if [the claimant] can make an adjustment to other work. If [the claimant] can make an adjustment to other work, [the ALJ] will find that [the claimant is] not disabled. If [the claimant] cannot make an adjustment to other work, [the ALJ] will find that [the claimant is] disabled.

20 C.F.R. § 404.1520(4); *see also Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001).

"Through step four, the claimant bears the burden of proving the existence

and severity of limitations caused by [his or] her impairments and the fact that [he or] she is precluded from performing [his or] her past relevant work." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 474 (6th Cir. 2003). The claimant must provide evidence establishing his or her RFC, which "is the most [the claimant] can still do despite [his or her] limitations," and is assessed using "all the relevant evidence in [the] case record." 20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1).

The burden transfers to the Commissioner if the analysis reaches the fifth step without a finding that the claimant is not disabled. *Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 643 (6th Cir. 2006). At the fifth step, the Commissioner is required to show that "other jobs in significant numbers exist in the national economy that [the claimant] could perform given [his or] her RFC and considering relevant vocational factors." *Rogers*, 486 F.3d at 214 (citing 20 C.F.R. §§ 416.920(a)(4)(v), (g)).

**D. ALJ Findings**

Following the five-step sequential analysis, the ALJ determined Plaintiff was not disabled.

At step one, the ALJ found Plaintiff had not engaged in substantial gainful activity since her alleged onset date of January 25, 2023. (ECF No. 6-1, PageID.85).

At step two, the ALJ found the following severe impairments: degenerative disc disease of the cervical spine; chronic obstructive pulmonary disease (COPD);

degenerative changes of the left hip; and hypertension. (*Id.* at PageID.86). At step three, the ALJ found none of the impairments, either independently or in combination, met or medically equaled in severity or duration the criteria of any listing. (*Id.* at PageID.87).

Next, the ALJ found Plaintiff had the RFC

> to perform light work as defined in 20 CFR 404.1567(b) except she can occasionally climb ramps and stairs, balance, stoop, kneel and crouch. She cannot crawl. She can never climb ladders, ropes or scaffolds. She should avoid workplace hazards such as unprotected heights and dangerous moving mechanical parts. She should avoid more than occasional exposure to pulmonary irritants such as dusts, odors, toxins and fumes. She should avoid more than occasional exposure to extreme heat and/or cold or humidity and/or wetness.

(*Id.* at PageID.88).

At step four, the ALJ found that Plaintiff was unable to perform any past relevant work. (*Id.* at PageID.91). However, at step five, the ALJ found other jobs in the national economy that Plaintiff could perform. (*Id.*). Specifically, the ALJ found Plaintiff could perform the requirements of an information clerk (69,000 jobs in the national economy), a marker (59,000), and a mail sorter (21,000). (*Id.* at PageID.92). Thus, the ALJ concluded Plaintiff was not disabled. (*Id.*).

### E. Administrative Record

On appeal, Plaintiff argues that the ALJ erred at step two when she found Plaintiff's mental impairments to be non-severe. Plaintiff further argues that this error permeated the remainder of the decision including the RFC finding. While the

Court has reviewed the entire record, it will only summarize the evidence relevant to Plaintiff's arguments.

The bulk of Plaintiff's medical records concern her physical impairments, which are not at issue on appeal. At a February 9, 2023 visit with her primary care provider (PCP), Plaintiff's screenings (PHQ-2 and PHQ-9) were positive for depression. (ECF No. 6-1, PageID.499). Her PCP noted: "Patient is very upset due to not being able to work and cannot make dinner. Patient is upset because she has to ask her husband for money, and she has never not worked." (*Id.* at PageID.497). Buspar[1] was prescribed to manage Plaintiff's mood-related symptoms. (*Id.* at PageID.501).

On March 2, it was noted that Plaintiff's anxiety and mood were stable on Buspar. (*Id.* at PageID.495). A week later, Plaintiff told her PCP that she "feels depressed and frustrated" about her abdominal pain but Plaintiff's depression screening (PHQ-2) was negative. (*Id.* at PageID.488–89). In late March, Plaintiff's PCP noted: "P[laintiff] states (anxiety) is doing ok . . . she doesn't take her medications like she's supposed to but she's doing ok. P[laintiff] states that she is not depressed but to listen to her speak, she sounds otherwise. P[laintiff] states that she doesn't need to take depression test because she is not depressed." (*Id.* at

[1] "Buspirone is used to treat certain anxiety disorders or to relieve the symptoms of anxiety." https://www.mayoclinic.org/drugs-supplements/buspirone-oral-route/description/drg-20062457 (last visited Sept. 2, 2026).

PageID.481). When pushed, Plaintiff reiterated that she was not depressed and was instead "just frustrated and sad at change in life since hyst[erectomy]." (*Id.* at PageID.483 (capitalization modified)). And in May 2023, Plaintiff's PCP stated: "No depression; No anxiety." (*Id.* at PageID.465). Plaintiff's May 4 and 18 depression screenings (PHQ-2) were negative. (*Id.* at PageID.460, 466).

On July 27, Plaintiff's PCP provided her with a "community resource list and encouraged to call for therapist to discuss feelings of PTSD following hyst[erectomy] . . . ." (*Id.* at PageID.662). For an October 2023 visit, her PCP again noted: "No depression; No anxiety." (*Id.* at PageID.769). And in December 2023, it was noted that Plaintiff still needed to "[f]ollow up with counseling." (*Id.* at PageID.764). Plaintiff's depression screenings (PHQ-2) were negative on January 18 and April 4, 2024. (*Id.* at PageID.852, 857).

On April 19, 2024, Plaintiff underwent an evaluation for mental health services with St. Clair County Community Mental Health. (*Id.* at PageID.832). When she called to schedule the evaluation, Plaintiff reported that her PCP had prescribed her Buspar but she no longer felt that it was effective. (*Id.* at PageID.835). And at the evaluation, she reported:

> A friend noticed a change in [Plaintiff] since she had a hysterectomy in 8/2022. She has had pain since her partial hysterectomy. They left the cervix only and likely has scar tissue that is causing immense pain. [Plaintiff] cannot clean herself, do her hair, cook her food, and cannot have sex anymore. Her sleep is interrupted by pain and she is also having menopause symptoms. [Plaintiff] lost her insurance temporarily

> but has finally regained it. She doesn't like to go outside. [Plaintiff] feels exposed and vulnerable. She admits she is not happy with her life or her body. She has never had a stomach bulge before as she was always thin. [Plaintiff] went from being extremely independent to totally dependent upon the help of others.

(*Id.*). The evaluator noted that Plaintiff "look[ed] rumpled with fair hygiene" but was "responsive with an agreeable attitude" and "presented as an attentive person with fair judgment." (*Id.* at PageID.839–41). Plaintiff's mood "was depressed and hopeless," she had decreased energy, and her ability to socially interact was impaired. (*Id.* at PageID.840–42). The evaluator determined that Plaintiff met the criteria for posttraumatic stress disorder (PTSD), moderate major depressive disorder, and generalized anxiety disorder, and recommended she begin receiving outpatient services. (*Id.* at PageID.842–44). A records release form from St. Clair County Community Mental Health states: "1/25/23 to 4/26/24 specifically requested. Noted: Services JUST started 4/19/24. Only the initial Assessment has been done at this time." (*Id.* at PageID.831).

At the July 29, 2024 hearing, Plaintiff testified that she received her diagnoses of PTSD, anxiety, and depression a few months earlier. (*Id.* at PageID.47). Her symptoms included forgetfulness, extreme difficulty with focus, discomfort around other people, and feelings of worthlessness. (*Id.* at PageID.48–50). Plaintiff had recently been prescribed Prazosin to help with her symptoms. (*Id.* at PageID.48). She spent most days watching TV. (*Id.*). Other evidence is discussed as relevant

below.

### F. Governing Law

The ALJ must "consider all evidence" in the record when making a disability decision. 42 U.S.C. § 423(d)(5)(B). The regulations, applicable to applications for disability benefits filed on or after the effective date of March 27, 2017, such as Plaintiff's application here, distinguish between acceptable medical sources, medical sources, and nonmedical sources. An acceptable medical source means a medical source who is a:

> (1) Licensed physician (medical or osteopathic doctor);
>
> (2) Licensed psychologist, which includes:
>
> > (i) A licensed or certified psychologist at the independent practice level; or
> >
> > (ii) A licensed or certified school psychologist, or other licensed or certified individual with another title who performs the same function as a school psychologist in a school setting, for impairments of intellectual disability, learning disabilities, and borderline intellectual functioning only;
>
> (3) Licensed optometrist for impairments of visual disorders, or measurement of visual acuity and visual fields only, depending on the scope of practice in the State in which the optometrist practices;
>
> (4) Licensed podiatrist for impairments of the foot, or foot and ankle only, depending on whether the State in which the podiatrist practices permits the practice of podiatry on the foot only, or on the foot and ankle;

> (5) Qualified speech-language pathologist for speech or language impairments only. For this source, *qualified* means that the speech-language pathologist must be licensed by the State professional licensing agency, or be fully certified by the State education agency in the State in which he or she practices, or hold a Certificate of Clinical Competence in Speech-Language Pathology from the American Speech-Language-Hearing Association;
>
> (6) Licensed audiologist for impairments of hearing loss, auditory processing disorders, and balance disorders within the licensed scope of practice only . . . ;
>
> (7) Licensed Advanced Practice Registered Nurse, or other licensed advanced practice nurse with another title, for impairments within his or her licensed scope of practice . . . ; or
>
> (8) Licensed Physician Assistant for impairments within his or her licensed scope of practice . . . .

20 C.F.R. § 404.1502(a) (2021). A medical source is

> an individual who is licensed as a healthcare worker by a State and working within the scope of practice permitted under State or Federal law, or an individual who is certified by a State as a speech-language pathologist or a school psychologist and acting within the scope of practice permitted under State or Federal law.

*Id.* § 404.1502(d). In contrast, a nonmedical source is "a source of evidence who is not a medical source." *Id.* § 404.1502(e). "This includes, but is not limited to: (1) [the claimant]; (2) Educational personnel (for example, school teachers, counselors, early intervention team members, developmental center workers, and daycare center workers); (3) Public and private social welfare agency personnel; and (4) Family members, caregivers, friends, neighbors, employers, and clergy." *Id.*

The Social Security Administration (SSA) "will not defer or give any specific

evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s), including those from [the claimant's] medical sources." *Id.* § 404.1520c(a). "The most important factors [the SSA] consider[s] when evaluat[ing] the persuasiveness of medical opinions and prior administrative medical findings are supportability (paragraph (c)(1) of this section) and consistency (paragraph (c)(2) of this section)." *Id.* The SSA will consider several factors when it contemplates "the medical opinion(s) and prior administrative medical findings" in a case. *Id.* § 404.1520c(c).

The first factor is "supportability." For this factor, "[t]he more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) or prior administrative medical finding(s), the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be." *Id.* § 404.1520c(c)(1).

The SSA will also consider the "consistency" of the opinion. In essence, "[t]he more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be." *Id.* § 404.1520c(c)(2).

In addition, the SSA will consider the source's "[r]elationship with the claimant." *Id.* § 404.1520c(c)(3). This factor includes analysis of:

> (i) Length of the treatment relationship. The length of time a medical source has treated [the claimant] may help demonstrate whether the medical source has a longitudinal understanding of [the claimant's] impairment(s);
>
> (ii) Frequency of examinations. The frequency of [the claimant's] visits with the medical source may help demonstrate whether the medical source has a longitudinal understanding of [the claimant's] impairment(s);
>
> (iii) Purpose of the treatment relationship. The purpose for treatment [the claimant] received from the medical source may help demonstrate the level of knowledge the medical source has of [the claimant's] impairment(s);
>
> (iv) Extent of the treatment relationship. The kinds and extent of examinations and testing the medical source has performed or ordered from specialists or independent laboratories may help demonstrate the level of knowledge the medical source has of [the claimant's] impairment(s);
>
> (v) Examining relationship. A medical source may have a better understanding of [the claimant's] impairment(s) if he or she examines [the claimant] than if the medical source only reviews evidence in [the claimant's] folder.

*Id.*

The fourth factor of the SSA's analysis is "specialization." In making this determination, the SSA will consider

> [t]he medical opinion or prior administrative medical finding of a medical source who has received advanced education and training to become a specialist may be more persuasive about medical issues related to his or her area of specialty than the medical opinion or prior administrative medical finding of a medical source who is not a specialist in the relevant area of specialty.

*Id.* § 404.1520c(c)(4).

Finally, the SSA will consider "other factors." These may include any other information that "tend[s] to support or contradict a medical opinion or prior administrative medical finding." *Id.* § 404.1520c(c)(5). Other factors include "evidence showing a medical source has familiarity with the other evidence in the claim or an understanding of our disability program's policies and evidentiary requirements." *Id.* Further, when the SSA considers "a medical source's familiarity with the other evidence in a claim, [it] will also consider whether new evidence [it] receive[s] after the medical evidence source made his or her medical opinion or prior administrative medical finding makes the medical opinion or prior administrative medical finding more or less persuasive." *Id.*

As to the duty to articulate how persuasive the medical opinions and prior administrative medical findings are considered, the new regulations provide "articulation requirements." The ALJ will consider "source-level articulation." Pursuant to this requirement,

> [b]ecause many claims have voluminous case records containing many types of evidence from different sources, it is not administratively feasible for [the ALJ] to articulate in each determination or decision how [he or she] considered all of the factors for all of the medical opinions and prior administrative medical findings in [each] case record. Instead, when a medical source provides multiple medical opinion(s) or prior administrative finding(s), [the ALJ] will articulate how [he or she] considered the medical opinions or prior administrative findings from that medical source together in a single analysis using the factors listed in paragraphs (c)(1) through (c)(5) of this section, as appropriate.

*Id.* § 404.1520c(b)(1). The regulation reiterates that the ALJ is "not required to articulate how [he or she] considered each medical opinion or prior administrative finding from one medical source individually." *Id.*

The regulations stress that the "factors of supportability (paragraph (c)(1) of this section) and consistency (paragraph (c)(2) of this section) are the most important factors [the SSA] consider[s] when [it] determine[s] how persuasive [it] find[s] a medical source's medical opinions or prior administrative medical findings to be." *Id.* § 404.1520c(b)(2). As such, the SSA

> will explain how [it] considered the supportability and consistency factors for a medical source's medical opinions or prior administrative medical findings in [the claimant's] determination or decision. [The SSA] may, but [is] not required to, explain how [it] considered the factors in paragraphs (c)(3) through (c)(5) of this section, as appropriate, when [it] articulate[s] how [it] consider[s] medical opinions and prior administrative medical findings in [the claimant's] case record.

*Id.*

When medical opinions or prior administrative findings are "equally persuasive," "well-supported," and "consistent with the record" "about the same issue," "but are not exactly the same, [the ALJ] will articulate how [he or she] considered the other most persuasive factors . . . for those medical opinions or prior administrative medical findings in [the claimant's] determination or decision." *Id.* § 404.1520c(b)(3). The regulations clarify that the SSA is "not required to articulate how [it] considered evidence from nonmedical sources using the requirements of

paragraphs (a)–(c) of this section." *Id.* § 404.1520c(d).

In addition, the regulations expressly state that the SSA will not consider "evidence that is inherently neither valuable nor persuasive" and "will not provide any analysis about how [it] considered such evidence in [its] determination or decision, even under § 404.1520c." *Id.* § 404.1520b(c). The regulations categorize evidence that is inherently neither valuable nor persuasive as: "[d]ecisions by other governmental and nongovernmental entities"; "[d]isability examiner findings," meaning "[f]indings made by a State agency disability examiner made at a previous level of adjudication about a medical issue, vocational issue, or the ultimate determination about whether [the claimant is] disabled"; and "[s]tatements on issues reserved to the Commissioner[,]" including

> (i) Statements that [the claimant is] or [is] not disabled, blind, able to work, or able to perform regular or continuing work;
>
> (ii) Statements about whether or not [the claimant has] a severe impairment(s);
>
> (iii) Statements about whether or not [the claimant's] impairment(s) meet the duration requirement . . . ;
>
> (iv) Statements about whether or not [the claimant's] impairment(s) meets or medically equals any listing in the Listing of Impairments . . . ;
>
> (v) Statements about what [the claimant's] residual functional capacity is using [the SSA's] programmatic terms about the functional exertional levels . . . instead of descriptions about [the claimant's] functional abilities and limitations . . . ;

> (vi) Statements about whether or not [the claimant's] residual functional capacity prevents [the claimant] from doing past relevant work . . . ;
>
> (vii) Statements that [the claimant] [does] or [does] not meet the requirements of a medical-vocational rule . . . ; and
>
> (viii) Statements about whether or not [the claimant's] disability continues or ends when [the SSA] conduct[s] a continuing disability review.

*Id.* § 404.1520b(c)(3).

The regulations also provide that

> [b]ecause a decision by any other governmental agency or a nongovernmental entity about whether [a claimant is] disabled, blind, employable, or entitled to any benefits is based on its rules, it is not binding on [the SSA] and is not [its] decision about whether [the claimant is] disabled or blind under [SSA] rules.

*Id.* § 404.1504. Therefore, the SSA "will not provide any analysis in [its] determination or decision about a decision made by any other governmental agency or a nongovernmental entity about whether [the claimant is] disabled, blind, employable, or entitled to any benefits." *Id.* The SSA will, however, "consider all of the supporting evidence underlying the other governmental agency or nongovernmental entity's decision that [it] receive[s] as evidence in [a] claim . . . ." *Id.*

The regulations clarify that "[o]bjective medical evidence means signs, laboratory findings, or both." *Id.* § 404.1502(f). Signs are defined as "one or more anatomical, physiological, or psychological abnormalities that can be observed,

apart from [the claimant's] statements (symptoms)." *Id.* § 404.1502(g). Further, "[s]igns must be shown by medically acceptable clinical diagnostic techniques. Psychiatric signs are medically demonstrable phenomena that indicate specific psychological abnormalities, e.g., abnormalities of behavior, mood, thought, memory, orientation, development or perception, and must also be shown by observable facts that can be medically described and evaluated." *Id.* Laboratory findings "means one or more anatomical, physiological, or psychological phenomena that can be shown by the use of medically acceptable laboratory diagnostic techniques," which "include chemical tests (such as blood tests), electrophysiological studies (such as electrocardiograms and electroencephalograms), medical imaging (such as X-rays), and psychological tests." *Id.* § 404.1502(c).

The most recent amendments to the regulations also tweaked the manner in which the SSA evaluates symptoms, including pain:

> In determining whether [the claimant is] disabled, [the SSA will] consider all [the claimant's] symptoms, including pain, and the extent to which [the] symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence. [The SSA] will consider all [the claimant's] statements about [his or her] symptoms, such as pain, and any description [the claimant's] medical sources or nonmedical sources may provide about how the symptoms affect [the claimant's] activities of daily living and [his or her] ability to work.

*Id.* § 404.1529(a). But the SSA clarified that

> statements about [the claimant's] pain or other symptoms will not alone

> establish that [the claimant is] disabled. There must be objective medical evidence from an acceptable medical source that shows [the claimant has] a medical impairment(s) which could reasonably be expected to produce the pain or other symptoms alleged and that, when considered with all of the other evidence (including statements about the intensity and persistence of [the claimant's] pain or other symptoms which may reasonably be accepted as consistent with the medical signs and laboratory findings), would lead to a conclusion that [the claimant is] disabled.

*Id.* Further, "[i]n evaluating the intensity and persistence of [the claimant's] symptoms, including pain, [the SSA] will consider all of the available evidence, including [the claimant's] medical history, the medical signs and laboratory findings, and statements about how [the claimant's] symptoms affect [him or her]." *Id.* The SSA will "then determine the extent to which [the claimant's] alleged functional limitations and restrictions due to pain or other symptoms can reasonably be accepted as consistent with the medical signs and laboratory findings and other evidence to decide how [the claimant's] symptoms affect [his or her] ability to work." *Id.*

Finally, the SSA noted that "[b]ecause symptoms sometimes suggest a greater severity of impairment than can be shown by objective medical evidence alone, [it] will carefully consider any other information [the claimant] may submit about [his or her] symptoms." *Id.* § 404.1529(c)(3). This other information may include "[t]he information that [the claimant's] medical sources or nonmedical sources provide about [the claimant's] pain or other symptoms," such as "what may precipitate or

aggravate [the claimant's] symptoms, what medications, treatments or other methods [the claimant uses] to alleviate them, and how the symptoms may affect [the claimant's] pattern of daily living," which "is also an important indicator of the intensity and persistence of [the claimant's] symptoms." *Id.*

> Because symptoms, such as pain, are subjective and difficult to quantify, any symptom-related functional limitations and restrictions that [the claimant's] medical sources or nonmedical sources report, which can reasonably be accepted as consistent with the objective medical evidence and other evidence, will be taken into account . . . . [The SSA] will consider all of the evidence presented, including information about [the claimant's] prior work record, [the claimant's] statements about [his or her] symptoms, evidence submitted by [the claimant's] medical sources, and observations by [the SSA's] employees and other persons.

*Id.* Factors relevant to a claimant's symptoms, such as pain, include:

> (i) [D]aily activities;
>
> (ii) The location, duration, frequency, and intensity of . . . pain or other symptoms;
>
> (iii) Precipitating and aggravating factors;
>
> (iv) The type, dosage, effectiveness, and side effects of any medication . . . taken to alleviate . . . pain or other symptoms;
>
> (v) Treatment, other than medication, . . . received for relief of . . . pain or other symptoms;
>
> (vi) Any measures . . . used to relieve . . . pain or other symptoms.

*Id.*

The new regulations also impose a duty on the claimant: "[i]n order to get

benefits, [the claimant] must follow treatment prescribed by [his or her] medical source(s) if this treatment is expected to restore [his or her] ability to work." *Id.* § 404.1530(a). Stated differently, "[i]f [the claimant does] not follow the prescribed treatment without a good reason, [the SSA] will not find [the claimant] disabled or, if [the claimant is] already receiving benefits, [the SSA] will stop paying . . . benefits." *Id.* § 404.1530(b). Acceptable (or "good") reasons for failure to follow prescribed treatment include:

> (1) The specific medical treatment is contrary to the established teaching and tenets of [the claimant's] religion;
>
> (2) The prescribed treatment would be cataract surgery for one eye, when there is an impairment of the other eye resulting in a severe loss of vision and is not subject to improvement through treatment;
>
> (3) Surgery was previously performed with unsuccessful results and the same surgery is again being recommended for the same impairment;
>
> (4) The treatment because of its magnitude (e.g., open heart surgery), unusual nature (e.g., organ transplant), or other reason is very risky for [the claimant]; or
>
> (5) The treatment involves amputation of an extremity, or a major part of an extremity.

*Id.* § 404.1530(c).

### G. Argument and Analysis

As stated above, Plaintiff argues the ALJ erred at step two when she found Plaintiff's mental impairments to be non-severe. Plaintiff further argues that this

error permeated the remainder of the decision including the RFC finding.

### 1. ALJ's Step Two Analysis

In the ALJ's step two analysis, she found Plaintiff had the "medically determinable mental impairments of major depressive disorder, posttraumatic stress disorder (PTSD), and anxiety, considered singly and in combination." (ECF No. 6-1, PageID.86). However, because these impairments, "considered singly and in combination, d[id] not cause more than minimal limitation in the claimant's ability to perform basic mental work activities," she found them to be non-severe. (*Id.*). In doing so, the ALJ considered the "four broad functional areas [that] are known as the 'paragraph B' criteria":

> The first functional area is understanding, remembering or applying information. In this area, the claimant has no limitation. Her intellectual functioning appeared normal at the consultative medical examination and her recent and remote memory for medical events was adequate (Exhibit 14F/4). Moreover, evidence shows she is able to drive, pay bills, count change, handle a savings account and use a checkbook/money orders. She denied needing help or reminders to take her medicine (Exhibits 4E; 14F/2).
>
> The next functional area is interacting with others. In this area, the claimant has mild limitation. She reports anxiety when she is in a crowd or around people she does not know. However, evidence shows she is able to live with her husband and spend time with others every day in person, on the phone, and via video chat (Exhibit 4E). The claimant also reported doing some shopping (Exhibit 14F/2). Her attitude at a mental health assessment was noted to be cooperative and she had good eye contact (Exhibit 19F/10).
>
> The third functional area is concentrating, persisting or maintaining pace. In this area, the claimant has mild limitation. She alleges

difficulty concentrating. However, evidence shows she is able to drive, count change, read, and watch TV (Exhibits 4E; 14F/2). Moreover, she denied difficulty concentrating at exams and was generally noted to be alert and oriented to person, place and time (e.g. Exhibits 8F/5, 28, 54; 10F/7; 11F/13; 12F/5).

The fourth functional area is adapting or managing oneself. In this area, the claimant has mild limitation. She alleges she does not handle stress well. However, she reported mainly physical limitations in her ability to do her own personal care and denied needing reminders to take care of personal needs and grooming (Exhibit 4E). In addition, she indicated at exams that she was able to care for herself and her general appearance at exams was noted to be normal (e.g. Exhibits 8F/45; 10F/7; 11F/13; 12F/5).

Because the claimant's medically determinable mental impairments cause no more than "mild" limitation in any of the functional areas and the evidence does not otherwise indicate that there is more than a minimal limitation in the claimant's ability to do basic work activities, they are nonsevere (20 CFR 404.1520a(d)(1)).

The limitations identified in the "paragraph B" criteria are not a residual functional capacity assessment but are used to rate the severity of mental impairments at steps 2 and 3 of the sequential evaluation process. The mental residual functional capacity assessment used at steps 4 and 5 of the sequential evaluation process requires a more detailed assessment. The following residual functional capacity assessment reflects the degree of limitation the undersigned has found in the "paragraph B" mental function analysis.

The State agency psychological consultants' findings of no limitation in understanding, remembering or applying information and mild limitation in interacting with others, concentrating, persisting or maintaining pace, and adapting or managing oneself are persuasive (Exhibits 1A; 4A). These prior administrative findings are consistent with the overall evidence which shows no history of specialized treatment for mental health symptoms. Moreover, the claimant's anxiety was noted to be stable as of March 2023 (Exhibit 8F/26, 40). A mental health assessment in April 2024 was normal except for a notation that the claimant had fair judgment (Exhibit 19F11). The State

> agency psychological consultants supported their findings with a detailed description of the evidence.

(*Id.* at PageID.86–87). The RFC limits Plaintiff to light work but does not contain additional limitations for Plaintiff's mental impairments. (*Id.* at PageID.88).

**2. Legal Standard**

"A 'severe impairment' is a medically determinable impairment that: (1) has more than a minimal effect on an individual's ability to perform physical or mental work; and (2) is 'expected to result in death [or] to last for a continuous period of at least 12 months.'" *Volbert v. Comm'r of Soc. Sec.*, No. 3:20-CV-0011, 2020 WL 8458805, at *5 (N.D. Ohio Dec. 14, 2020) (quoting 20 C.F.R. §§ 416.909, 416.922), *report and recommendation adopted*, 2021 WL 164218 (N.D. Ohio Jan. 19, 2021). "The Sixth Circuit has characterized step two of the disability determination process as a de minimis hurdle." *Martha P. v. Comm'r of Soc. Sec.*, No. 23-CV-10134, 2023 WL 9501719, at *4 (E.D. Mich. Dec. 11, 2023) (citation modified), *report and recommendation adopted*, 2024 WL 393513 (E.D. Mich. Jan. 31, 2024). In other words, "an impairment can be considered not severe only if it is a slight abnormality that minimally affects work ability regardless of age, education, and experience." *Higgs v. Bowen*, 880 F.2d 860, 862 (6th Cir. 1988). Nonetheless, a diagnosis alone "says nothing about the severity of the condition" and it is a plaintiff's "burden to prove the severity of her impairments." *Id.* at 863. Ultimately, "the question . . . is whether there is substantial evidence in the record supporting the ALJ's finding" that

the impairment in question was slight. *Farris v. Sec'y of Health & Hum. Servs.*, 773 F.2d 85, 90 (6th Cir. 1985).

Additionally, "when an ALJ determines that one (or more) of a claimant's impairments is severe, the ALJ then proceeds to consider the limitations and restrictions imposed by *all* of an individual's impairments, even those that are not severe." *Kestel v. Comm'r of Soc. Sec.*, 756 F. App'x 593, 597 (6th Cir. 2018) (citation modified). "Thus, because an ALJ considers all of a claimant's impairments in the remaining steps of the disability determination, any perceived failure to find additional severe impairments at step two does not constitute reversible error." *Id.* (citation modified).

**3. Application**

Here, the ALJ's finding that Plaintiff's mental impairments were non-severe is supported by substantial evidence. As the ALJ explained in the decision, her finding is consistent with the opinions of both agency reviewers. This case is thus immediately distinguishable from *Martha P.*, on which Plaintiff relies. In that case, Chief Magistrate Judge David R. Grand recommended remand after finding errors in the ALJ's step two analysis. *Martha P.*, 2023 WL 9501719, at *3–*6. Among other problems, "the ALJ discounted all of the medical opinions and administrative findings discussed above, but he failed to sufficiently articulate his reasons for doing so, and the reasons he did articulate are not supported by substantial evidence." *Id.*

Conversely, the ALJ's finding of non-severity here is consistent with the opinions of the agency reviewers and, as will be explained, is supported by substantial evidence.

When Plaintiff's application was initially denied in August 2023, it was noted that

> [Claimant] does not allege any [mental health (MH)] issues but [medical evidence of record (MER)] notes anxiety. [Claimant] denies any depression on multiple occasions in MER. [Claimant] does take meds for anxiety that is prescribed by PCP but MER notes that she does not take the meds regularly. While [Claimant] does note issues in [activities of daily living (ADLs)] they are mostly physical related and not mental in nature. [Claimant is] not in mental health services and has never had any in patient psych hospitalizations. MER clearly supports that severity is not enough to meet any listing. Given overall information any MH related issue is not severely limiting and therefore deemed non sever[e] in nature.

(ECF No. 6-1, PageID.62). In finding Plaintiff's mental impairments to be non-severe, the psychological reviewer considered the Paragraph B criteria for assessing mental impairments and found that Plaintiff had no limitations in her abilities to understand, remember, or apply information and only mild limitations in her abilities to interact with others; cooperate, persist, or maintain pace; and adapt or manage herself. (*Id.* at PageID.63–64). In January 2024, the reviewer on reconsideration reached the same conclusions as the initial reviewer. (*Id.* at PageID.74).

Plaintiff argues that the reviewers' opinions are less persuasive than they otherwise would be because in April 2024 she underwent a psychological evaluation

and presumably began treatment. However, Plaintiff applied for disability benefits in February 2023, with an alleged onset date the month prior, and could have begun mental health treatment sooner if she wanted the reviewers to have more evidence regarding the severity of her mental impairments. *Cf. Volbert*, 2020 WL 8458805, at *6 (affirming non-severe finding where ALJ based finding on plaintiff's failure to seek mental health treatment). Instead, Plaintiff did not act when she received a list of community resources for mental health services from her PCP in July 2023 (ECF No. 6-1, PageID.662), and her PCP noted a few months later that she had "No depression; No anxiety" (*id.* at PageID.769). Other records show that Plaintiff routinely screened negative for depression (*id.* at PageID.460, 488–89, 852, 857) and during a March 2023 appointment, she adamantly denied having depression (*id.* at PageID.481, 483). *See Volbert*, 2020 WL 8458805, at *6 ("I also note that Volbert has not cited any evidence from the treatment records that would support a finding that his mental health impairments were severe. To the contrary, treatment notes show that Volbert denied any mental health issues; he did not seek any mental health treatment; he did not testify that his mental health impairments prevented him from working; and his reported activities of daily living did not suggest any functional limitations based on mental health impairments." (citation modified)). "Similarly, taking medication for anxiety and depression is not necessarily, in and of itself, strong evidence of having a disability, let alone conclusive evidence because it is not

uncommon to take such medications in this country, and countless numbers of duly employed workers and students are on them." *Momany v. Comm'r of Soc. Sec.*, No. 2:17-CV-10626, 2019 WL 1503129, at *4 (E.D. Mich. Jan. 23, 2019) (citation modified).

Moreover, while the reviewers' opinions were made in the absence of Plaintiff's April 2024 evaluation, the ALJ's finding of non-severity was not. The ALJ considered the evaluation, stating that Plaintiff's "attitude at a mental health assessment was noted to be cooperative and she had good eye contact" and that the assessment "was normal except for a notation that the claimant had fair judgment." (ECF No. 6-1, PageID.86–87). A more thorough summation could have included details like Plaintiff "look[ed] rumpled with fair hygiene," before noting she was "responsive with an agreeable attitude" and "presented as an attentive person with fair judgment." (*Id.* at PageID.839–41). And also, that Plaintiff's mood "was depressed and hopeless," she had decreased energy, and her ability to socially interact was impaired. (*Id.* at PageID.840–42). But "an ALJ's failure to cite specific evidence does not mean that an ALJ failed to consider that evidence." *Kovach v. Comm'r of Soc. Sec. Admin.*, No. 1:25-CV-2506, 2026 WL 1656939, at *6 (N.D. Ohio June 9, 2026). And here, the ALJ advised that she found Plaintiff not to be disabled "[a]fter careful consideration of *all* the evidence." (*Id.* at PageID.84

(emphasis added)).

Moreover, the ALJ noted elsewhere in her Paragraph B analysis that Plaintiff "reported mainly physical limitations in her ability to do her own personal care and denied needing reminders to take care of personal needs and grooming." (*Id.* at PageID.87). This is consistent with the medical evidence and Plaintiff's testimony regarding her need for caregivers to help get her ready in the morning due to her physical impairments. (*See, e.g.*, *id*. at PageID.48 (testifying that "[m]y provider comes between 6:00 and 7:00 to keep me up and get me prepped for the day, prepared or whatever")). Additionally, the ALJ found that Plaintiff had mild limitations in three of the four broad areas of functioning, including interacting with others. *Cf. Showalter v. Kijakazi*, No. 22-5718, 2023 WL 2523304, at *3 (6th Cir. Mar. 15, 2023) ("Showalter faults the ALJ for not explicitly acknowledging that some of her activities were limited. But the ALJ explained that 'after careful consideration of the entire record' he found that Showalter had 'some significant limitations due to her impairments, such that she should avoid heavier lifting, reaching overhead, and working around hazards and irritants.' In other words, he considered the evidence of her limitations and tailored her residual functional capacity accordingly." (citation modified)).

The Sixth Circuit does not "require an ALJ to discuss every piece of evidence in the record"; instead, courts must "simply determine whether there is substantial

evidence in the record to support the conclusion." *Id.* (citation modified). Thus, while Plaintiff faults the ALJ for not acknowledging every notable finding from the April 2024 evaluation, her decision shows that she fully considered the evaluation, even though she did not reach the result that Plaintiff would understandably prefer. *See Napier v. Comm'r of Soc. Sec.*, 127 F.4th 1000, 1006–07 (6th Cir. 2025) ("Napier argues that in stating that Napier's medical examination findings were 'relatively benign,' the ALJ ignored some of Dr. Palmer's findings, including that Napier was estimated 'to be functioning in the borderline range of general intelligence' and had a history of suicidal thoughts. We do not read the ALJ to have impermissibly mischaracterized Dr. Palmer's report."); *cf. Houser v. Comm'r of Soc. Sec. Admin.*, No. 5:21-CV-00369, 2022 WL 1803049, at *9 (N.D. Ohio June 2, 2022) ("These 'missing' pieces of evidence do not erase the substantial evidence supporting the ALJ's decision. The Court will not reweigh the evidence.").

In the end, the ALJ's finding that Plaintiff's mental impairments were non-severe is supported by substantial evidence. Plaintiff's only positive depression screenings were from February 9, 2023 (ECF No. 6-1, PageID.499); her screenings were negative in March 2023 (*id.* at PageID.488–89), May 2023 (*id.* at PageID.460, 466), January 2024, and April 2024 (*id.* at PageID.852, 857). In late March 2023, Plaintiff's PCP attempted to glean insight into Plaintiff's possible symptoms of depression, but Plaintiff appears to have repeatedly denied being depressed, instead

saying that she was "just frustrated and sad at change in life since hyst[erectomy]." (*Id.* at PageID.481, 483 (capitalization modified)).

While Plaintiff's symptoms may have increased in April 2024, leading her to seek out mental health services for the first time, she "had the burden of showing that [s]he had a severe impairment that met the twelve-month duration requirement." *Harley v. Comm'r of Soc. Sec.*, 485 F. App'x 802, 803 (6th Cir. 2012). To do so she needed to "show that [s]he ha[d] an impairment that ha[d] lasted or is expected to last for a continuous period of at least twelve months and that h[er] impairment ha[d] significantly limited h[er] ability to do basic work activities." *Id.* Thus, even if Plaintiff had increased periods of depressive symptoms, it is doubtful that she could establish on this record that her mental impairments had lasted or could be expected to last for a continuous 12-month period.

Finally, even if the ALJ had erred in finding Plaintiff's mental impairments to be non-severe, "such an error was harmless because the ALJ stated that [s]he considered the non-severe impairments at later steps in the sequential evaluation." *Volbert*, 2020 WL 8458805, at *7. "So long as the ALJ considers all the claimant's impairments—severe and non-severe—in the remaining steps of the disability determination, any error at Step Two is harmless." *Id.* And the ALJ did so here, saying that "pursuant to SSR 96-8p, all of the claimant's severe and non-severe conditions were considered when assessing the residual functional capacity." (*Id.* at

PageID.86). She also specifically discussed this principle in relation to her Paragraph B analysis, explaining:

> The limitations identified in the "paragraph B" criteria are not a residual functional capacity assessment but are used to rate the severity of mental impairments at steps 2 and 3 of the sequential evaluation process. The mental residual functional capacity assessment used at steps 4 and 5 of the sequential evaluation process requires a more detailed assessment. The following residual functional capacity assessment reflects the degree of limitation the undersigned has found in the "paragraph B" mental function analysis.

(*Id.* at PageID.87). "Though there may be occasions where, in context, similar statements would be insufficient, this is not such a case." *Napier*, 127 F.4th at 1007.

Because the ALJ stated that she considered both Plaintiff's severe and non-severe impairments at the remaining steps of the analysis, any error in finding Plaintiff's mental impairments non-severe was harmless. *See id.* ("Thus, even if the ALJ had erred by finding that [Plaintiff's] mental health impairments were not severe, any error was harmless because the ALJ stated that he considered [Plaintiff's] non-severe impairments at other steps of the sequential evaluation to the extent they were consistent with the objective medical evidence and other evidence."); *see also Hedges v. Comm'r of Soc. Sec.*, 725 F. App'x 394, 395 (6th Cir. 2018) (per curiam) (holding that once the ALJ had found at least one severe impairment and considered the limiting effects of all impairments, "whether the ALJ characterized the claimant's mental-health impairments as severe or non-severe at step two was legally irrelevant and did not amount to error" (citation modified)).

While Plaintiff argues that such error would not be harmless because the ALJ failed to incorporate any limitations regarding her mental impairments in the RFC, "Plaintiff fails to point to any additional restrictions that would have been included in the RFC had the ALJ more specifically listed anxiety or depression as a severe impairment in his written determination, and accordingly h[er] challenge to the ALJ's Step 2 determination fails." *Momany*, 2019 WL 1503129, at *4.

## III. ORDER

For these reasons, Plaintiff's motion for summary judgment is **DENIED** (ECF No. 11), Defendant's motion for summary judgment is **GRANTED** (ECF No. 12), and the ALJ's decision is **AFFIRMED**.

**IT IS SO ORDERED.**

Date: September 17, 2026

S/PATRICIA T. MORRIS
Patricia T. Morris
United States Magistrate Judge